***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby MODIFIES the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and following in a Pre-Trial Agreement admitted into evidence by the Deputy Commissioner as:
 STIPULATIONS
1. The date of the admittedly compensable injury giving rise to this claim is 2 May 2001. Defendant admitted the compensability of and their liability for plaintiff's back injury by virtue of a Form 21 agreement that was approved by the Industrial Commission on 10 December 2001.
2. On such date, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On such date, an employment relationship existed between plaintiff and defendant.
4. On such date, defendant employed three or more employees.
5. Defendant is self-insured, and Cambridge Integrated Services Group, Inc. is the administrator of Kmart's self-insured plan.
6. Plaintiff's average weekly wage is $408.00. This yields an applicable compensation rate of $272.00.
7. Pursuant to the approved Form 21 agreement, plaintiff began receiving temporary total disability benefits on 17 August 2001 and continuing for necessary weeks. Plaintiff thereafter returned to work on or about 25 October 2001 and she began receiving temporary partial disability benefits pursuant to a Form 26 supplemental agreement that was approved by the Commission on 17 December 2001. After the filing of the Form 28U, plaintiff again began receiving temporary total disability benefits as of 1 April 2002. Plaintiff has been out of work since 25 January 2002.
8. Subsequent to the hearing before the Deputy Commissioner, the Deputy Commissioner filed an order on 7 November 2002 excluding all testimony allegedly tainted by defendants' improper ex parte communication. This order is incorporated herein by reference. However, because plaintiff did not renew her objections or further pursue this issue in the course of her contentions, this issue is deemed waived and a further ruling is not made herein on that basis.
9. In addition to the deposition transcripts and the exhibits attached thereto, the parties stipulated into evidence of record at the hearing before the Deputy Commissioner the following exhibits: (1) plaintiff's medical records; and (2) discovery responses.
 ***********
Based upon the greater weight of the competent and credible evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, plaintiff was 63 years old. Plaintiff was not working in any capacity for any employer as of the date of the hearing before the Deputy Commissioner.
2. On 2 May 2001 plaintiff was employed by defendant as the jewelry department manager, and plaintiff had been employed by defendant for approximately sixteen years.
3. On 2 May 2001, plaintiff sustained an admittedly compensable injury by accident to her low back as a direct result of a specific traumatic incident when she bent down and twisted while dealing with some jewelry. Defendant admitted plaintiff's claim pursuant to a Form 21 agreement that was approved by the Industrial Commission on 10 December 2001.
4. Plaintiff first presented for medical treatment with Dr. Danielle Mahaffey, her family physician, on 12 May 2001. Plaintiff ultimately came under the care of Dr. Samuel A. Sue, an orthopaedic surgeon, on 31 July 2001. Plaintiff had continued working for defendant from the date of her injury through the date she came under the care of Dr. Sue. X-rays revealed degenerative disc disease of the lumbar spine. Because plaintiff's complaints persisted, Dr. Sue ordered an MRI and wrote plaintiff out of work.
5. The MRI, which was done on 18 August 2001, revealed advanced degenerative facet arthropathic changes at L4-S1, stenosis, and a small central herniated disc at L2-3. It was also noted that plaintiff has the congenital abnormality of having no fifth lumbar vertebra.
6. Because the MRI did not show any surgical lesion, Dr. Sue treated plaintiff conservatively, with physical therapy and first with a steroid dose pack and later with anti-inflammatory medication. Dr. Sue prescribed Vioxx, a COX-2 inhibitor and nonsteroidal anti-inflammatory medication. Physical therapy seemed to improve plaintiff's symptoms.
7. On 16 October 2001, plaintiff reported that she had improving back pain and no hip or leg pain. However, on this date it was noted that plaintiff's blood pressure was markedly elevated. Dr. Sue took plaintiff off Vioxx and put her on a different anti-inflammatory, which later had to be changed again due to plaintiff's intolerance of the second anti-inflammatory medication. Elevated blood pressure is a recognized side effect of Vioxx. However, the normal reaction is an increased systolic reading, not necessarily an increased diastolic reading. In plaintiff's case, both systolic and diastolic readings were elevated. Plaintiff's blood pressure remained elevated, but not as markedly so, after she discontinued use of Vioxx.
8. Dr. Sue released plaintiff to return to work at four hours a day the week of 23 October 2001. On 6 November 2001 Dr. Sue indicated that plaintiff should work another week at four hours then return to work at full time, full duty. Plaintiff did return to work for defendant.
9. Plaintiff returned to work and worked on a full-duty, full-time basis. On 12 December 2001 plaintiff reported to Dr. Sue with increased complaints of back pain. Accordingly, Dr. Sue referred plaintiff to Dr. Ramos for further treatment.
10. On 18 January 2002 Dr. Ramos, a physiatrist, performed a selective nerve root block at L3, L4. Based upon the greater weight of the evidence, plaintiff tolerated the injection well, and she was able to bear weight on her legs, and in fact, the injection seemed to help plaintiff. Plaintiff returned to work after having been out of work for a short period of time.
11. One week following the injection, on 25 January 2002 at 5:30 a.m., plaintiff had a sudden onset of extreme weakness in her legs and a gait disorder, ataxia, which is an inability to coordinate voluntary muscular movement. Plaintiff was admitted to the hospital for these symptoms, and she related them to the steroid injection of the previous week. Plaintiff was treated in the hospital by Dr. Catherine A. Weymann, a neurologist who in August 2001 had tested plaintiff for an episode of slurred speech and loss of short-term memory. CT scans of the head and MRIs of the head and brain revealed no evidence of a stroke, intercerebral hemorrage, or infarct. Plaintiff also was evaluated by several neurologists. No physiological cause was diagnosed for plaintiff's complaints.
12. Plaintiff was discharged from the hospital on 27 January 2002. On 28 January 2002 she returned to Dr. Ramos on an emergency basis. Dr. Ramos did not believe that the steroid injection on 18 January 2002 was the cause of plaintiff's symptoms, as the symptoms developed one week after the injection. Dr. Ramos felt plaintiff had an adverse reaction to the injection would have manifested itself immediately or much sooner than a week later. Dr. Ramos also noted that plaintiff had an adequate workup in the hospital, which included diagnostic testing and neurological examinations, yet no physiological cause was found and her symptoms were not anatomically or neuromuscularly explainable. Dr. Ramos indicated that there might be a conversion disorder component, but referred her to physical therapy for further objective evaluation.
13. On 2 February 2002, while being evaluated by the physical therapist, plaintiff had a sudden recurrence of her symptoms whereby her legs and right arm began shaking uncontrollably, and she was unable to ambulate. Plaintiff's husband took her back to the hospital, where she was evaluated and treated by Dr. Michael L. Reynolds, a neurologist. Dr. Reynolds noted plaintiff's unusual symptoms; for instance, plaintiff's tremors were not like tremors normally seen in neurological disorders. Dr. Reynolds could find nothing neurologically wrong with plaintiff, and her symptoms did not make sense as an acute organic phenomenon. Dr. Reynolds testified that while the steroids in plaintiff's system could have contributed to her general edginess and anxiety, he saw no direct relationship between the injection and her symptoms, as such a reaction to a steroid injection had never been described or seen by him.
14. It was Dr. Reynolds' opinion to a reasonable degree of medical certainty that plaintiff's problems were caused by a psychological reaction, likely a conversion reaction. Dr. Reynolds recommended a psychiatric evaluation and further follow-up with Dr. Willis and her family physician.
15. Plaintiff reported back to Dr. Sue on 5 February 2002, and again on 12 February 2002. Dr. Sue noted plaintiff's athetoid (i.e., abnormal jerking) motions, but these seemed to be improving by 12 February 2002. Dr. Sue testified that he has never seen a steroid injection cause the sort of reaction suffered by plaintiff. On 13 February 2002, plaintiff followed up with Dr. C. Keith Willis, another neurologist she had seen in August 2001 when she suffered the episode of memory loss and slurred speech. Dr. Willis noted that plaintiff had "probable hysterical gait disorder."
16. Plaintiff was also seen again by Dr. Ramos on 14 March 2002, and she and her husband apparently related all of her symptoms to the injection given by the physician. Dr. Ramos felt that given the circumstances, no further injections were warranted, and that plaintiff should continue to follow up with Dr. Willis or a neuropsychologist. Dr. Ramos refused to sign a Form 28U certifying that plaintiff was unable to continuing working on a trial return to work basis, as he felt the form was more appropriately reviewed by Dr. Sue. Dr. Ramos did not see or treat plaintiff after this date.
17. Dr. Ramos testified that he has not seen the type of reaction that plaintiff experienced from the steroid injection either before or since that time, despite having done thousands of steroid injections. Dr. Ramos further testified that in his opinion, plaintiff's symptomatology following the injection was caused not by the injection itself but due to a possible psychosomatic conversion disorder.
18. Dr. Sue signed the Form 28U on 21 March 2002, thereby certifying that plaintiff was unable to continue working on the trial return to work basis. Dr. Sue's testimony, however, indicates that he signed the Form 28U in error.
19. A Form 26 was executed by the parties and approved by the Commission on December 17, 2001. The Form 26 acknowledged plaintiff's return to work and the parties stipulated that plaintiff had returned to work at an average weekly wage of $204.00 per week on October 25, 2001. Plaintiff's new average weekly wage was $136.00 per week less than she had made at the time of her injury and the parties stipulated that plaintiff was entitled to temporary partial disability compensation.
20. Plaintiff continued under the care of Dr. Sue, and her back symptoms appeared to improve. Dr. Sue recommended physical therapy, aquatic therapy, and continuous treatment/exercise at a fitness facility. Plaintiff was last treated by Dr. Sue on 26 June 2002, who retired two days later. At this last examination, Dr. Sue noted that plaintiff continued to complain of low back pain and other, newer symptoms such as left hip pain and right thigh pain. Dr. Sue did not release plaintiff to return to work on this visit, but instead referred plaintiff for a functional capacity evaluation. The functional capacity evaluation was unable to be completed due to plaintiff's high blood pressure.
21. Plaintiff came under the care of Dr. Elaine R. Feraru, a neurologist, on 27 August 2002. Based upon what Dr. Feraru felt was a large psychological component, she ordered an MMPI, a personality test. The results of the MMPI and the lack of concrete objective neurologic findings, and Dr. Feraru suspected that plaintiff has a somatization or a conversion disorder. Dr. Feraru found plaintiff had an exaggerated response to pain such that stress leads to a physical reaction or symptom.
22. Plaintiff has also treated with Dr. Henry J. Elsner, a neurosurgeon. Tests performed at Dr. Elsner's direction, including a cervical MRI and EMG and nerve conduction studies, located no anatomic explanation for plaintiff's complaints of right-sided weakness. Dr. Elsner has indicated that there are no further recommendations regarding treatment.
23. Because several of the physicians in her case have suggested a psychological component to her complaints, plaintiff self-referred to Dr. John Rodenbough, a psychologist and neuropsychologist. Dr. Rodenbough saw plaintiff on four occasions. It is Dr. Rodenbough's opinion that plaintiff's problems are primarily physical in nature, and that she was having a reaction to her back pain and the subsequent difficulties she thereafter experienced. Accordingly, Dr. Rodenbough did not feel that plaintiff was suffering from a conversion or somatoform disorder, but instead that she was suffering from adjustment difficulties relating to her ongoing pain. Dr. Rodenbough's testimony that plaintiff's complaints have been caused by her medical condition is not deemed credible, as it is directly contradicted by all of the medical records and opinions that demonstrate that plaintiff has no neurological condition that would cause tremors or weakness, and because Dr. Rodenbough is not a medical doctor and has not performed medical examinations on plaintiff.
24. Plaintiff has been treated by at least two cardiologists, Dr. Helen Ann Preston and Dr. Jordan. A pharmacologic stress test done by Dr. Preston on 10 January 2002 was unremarkable, and plaintiff was referred back to Dr. Mahaffey, her family physician. Plaintiff has also been treated by Dr. Jordan for refractory (uncontrolled) hypertension. By October 2002, Dr. Jordan felt that plaintiff's hypertension was adequately controlled, but that plaintiff will need to be on high blood pressure medicine for the rest of her life. Plaintiff's hypertension does not render her unable to work or incapable of driving.
25. Plaintiff contends that her high blood pressure was caused or exacerbated by taking the Vioxx prescribed to her by Dr. Sue. However, the medical records submitted reveal that even prior to October 2001, on several occasions plaintiff had been found by her family physician and by at least one other physician to have elevated blood pressure. Plaintiff had underlying central hypertension prior to taking Vioxx and even after discontinuing its use, plaintiff continued to have some problems with controlling her hypertension.
26. While some of the testimony is to the effect that plaintiff's elevated blood pressure is not related to her use of Vioxx, the Deputy Commissioner assigned greater weight and credibility to the opinion of plaintiff's treating cardiologist, Dr. Jordan. The Full Commission, however, finds the greater weight of the medical evidence shows plaintiff's blood pressure continued to be elevated upon her discontinuation of Vioxx and the majority of the medical evidence does not establish a correlation.
27. Based upon the greater weight of the evidence presented, including the testimony of virtually every physician in this case, plaintiff suffers from a psychological component, likely somatoform disorder, such that psychological stress and underlying pain complaints manifest themselves into the physical reactions of numbness, weakness, and tremors. The greater weight of the medical testimony shows plaintiff was predisposed to such a psychological disorder based upon her previous medical records and personality traits. The Full Commission finds though plaintiff did not experience these types of complaints prior to her injury by accident, the medical testimony does not relate her symptoms to her injury by accident.
28. The Full Commission finds that the presumption of continuing temporary total disability ended when the parties filed the Form 26. Plaintiff is entitled to temporary partial disability compensation after October 25, 2001 when she returned to work at a reduced wage.
29. There is insufficient evidence of record from which the Full Commission can find and hold by the greater weight that plaintiff's husband is entitled to reimbursement for driving his wife to appointments.
30. Pursuant to the Form 26 filed in this case plaintiff's temporary partial disability rate is $136.00 per week.
 ***********
The foregoing stipulations and findings of fact result in the following additional:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident as a direct result of a specific traumatic incident on 2 May 2001. N.C. Gen. Stat. § 97-2(6). Based upon the filing of the Form 21, plaintiff was entitled to the presumption of ongoing disability. The approval of the Form 26 by the Commission on 17 December 2001 ended the presumption of total disability and plaintiff received temporary partial disability. Plaintiff has not shown, based on the greater weight of the medical evidence, that any total disability after October 25, 2001 is related to her injury by accident. Id.
2. Plaintiff's disability subsequent to 25 January 2002 is not related to her compensable accident. Plaintiff is not entitled to any disability benefits subsequent to 25 January 2002. N.C. Gen. Stat. § 97-2(9).
3. The plaintiff's psychological condition was not a natural and proximate result of plaintiff's underlying, compensable back injury. Plaintiff's psychological condition is not compensable. N.C. Gen. Stat. § 97-2(6).
4. Plaintiff has not shown by the greater weight of the evidence that her continuing high blood pressure is as a result of her temporary use of Vioxx. Accordingly, this condition is not compensable under the Act. N.C. Gen. Stat. § 97-2(6).
5. Plaintiff is entitled to receive medical treatment related to her back condition that was or is reasonably necessary to effect a cure, give relief, or lessen the period of her disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25. Plaintiff's treatment for hypertension is related only insofar as she was treated for this condition while she was on or immediately off Vioxx. Plaintiff is not entitled to ongoing medical compensation for hypertension. Id.
6. Plaintiff's husband is not entitled to receive compensation for attendant care or travel expenses. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff is entitled to temporary total disability benefits from 17 August 2001 to 25 October 2001. Plaintiff is thereafter entitled to temporary partial disability from 26 October 2001 through 25 January 2002. To the extent that this compensation has not been paid, these amounts shall be paid in a lump sum.
2. The plaintiff is not entitled to compensation as of 25 January 2002 and subsequent because her disability starting 25 January 2002 and continuing is not related to the compensable low back condition.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25 percent of the compensation owed herein to plaintiff. Plaintiff's attorney shall receive one-fourth of any accrued amount in a lump sum.
4. Defendant shall provide plaintiff with all related medical treatment as specified herein, to the extent such treatment is designed to effect a cure, give relief, or lessen the period of her disability.
5. Defendant shall bear the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER